IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Theodore Lucio, et al.,            Case No. 3:14CV1849

      Plaintiffs,

  v.                                  **ORDER**

Levy Environmental Services
  Company, et al.,

      Defendants.

This is an employee's tort action in which plaintiff seeks recovery against his employer for severe injuries he suffered when he fell approximately twenty-five feet from an unguarded screen deck on a slag mill tower.

Plaintiff Theodore Lucio brings suit under O.R.C. § 2745.01, alleging Defendant Levy Environmental Company (Levy), among others, acted with deliberate intent to harm him. Additionally, Lucio's wife alleges a loss of consortium claim due the injuries Lucio sustained from the fall.

I have jurisdiction under 18 U.S.C. § 1332.

Pending are two motions: 1) Levy's motion to exclude the opinion of Lucio's expert, Vincent Gallagher (Doc. 33); and 2) Levy's motion for summary judgment (Doc. 25).

For the reasons discussed below, I: 1) grant Levy's motion to exclude in part and deny it in part; and 2) grant Levy's motion for summary judgment.

**Background**

Levy owns and operates several slag mills throughout the country, including one at the facility commonly known as Fulton Mill in Delta, Ohio. (Doc. 26-6 ¶ 3). Fulton Mill is an onsite contractor for North Star Blue Scope steel mill (NSBS). (Doc. 26-5 at11). Fulton Mill removes slag, which is the by-product of steel, from NSBS's furnace and processes it into useable product such as aggregate, asphalt, or other paving material. (Doc 26-1 at 11; Doc. 26-5 at 13).

NSBS deposits the molten slag in slag pots. Levy then transports them to Fulton Mill and discharges them into cooling pits. (Doc. 26-5 at 11-12). Once the slag has cooled, Levy removes the material from the pits and stores it in piles until ready for processing at the slag mill. (Doc. 26-1 at 11; Doc. 26-5 at 13).

Fulton Mill has four separate slag mills, referred to as Towers One through Four. (Doc. 26-4 at 22-23). At Tower Two, a conveyor moves the slag to near the top of the slag mill, and then dumps it into a stone hopper, which sifts the material through a screen to separate the smaller from the larger usable material. (*Id.* at 22, 27). The larger material goes down through a crusher and is recycled. (*Id.* at 22). The smaller material may be further processed through the smaller finishing screens at Tower One. (*Id.*).

The mill is about thirty feet high. Guard rails surround a series of walking platforms. Staircases at the end of the platforms enable employees to reach the hopper. (*Id.*, Ex. 7 at 2). One of the walkway platforms is about six feet below the hopper. (Doc. 26-1 at 38). An overhead deck covers about two thirds of the hopper, and consists of I-beams supporting the walkway structure. (Doc 26-4 at 30).

The hopper sits near the top of the mill and resembles a box with an open top. (Doc. 26-1 at 35). The sides of the hopper have rubber edges approximately twenty-eight inches high that prevent the slag from being thrown out of the hopper while operating. (*Id.* at 37; Doc. 1-1 ¶ 13). The hoppers do not have guard rails. (Doc. 26-6 ¶ 8).

The "floor" of the hopper is known as the screen deck. It consists of a stationary piece of screening, followed by two separate removable metal screens that sit side by side and extend the remaining width and length of the hopper. (Doc. 26-2 at 30). The screen deck measures about five by twelve feet. (Doc. 26-5 at 26). The screens sit on a steel frame at the bottom of the rubber sides of the hopper. (*Id.* at 25). Bolts along the lower portion of the hopper secure tension plates that hold the screens in place. (Doc. 26-4, Ex. 2). The area directly below the screen is not open to the ground. Steel cross bars sit immediately below the screen, and below the cross bars is a metal chute that empties into the stone crusher. (Doc. 26-1 at 31; Doc. 26-4 at 73, Ex. 7 at 3).

The screen deck is sloped at thirty to forty degrees so oversized stone material will funnel into the chute below and at the end of the screen deck. (Doc. 26-5 at 23). The hopper shakes the slag so that the useable material sifts through the screen. (Doc. 26-6 ¶ 8). Workers change the screens approximately once a week, either when the screens are worn out or to switch to screens with smaller or larger grates to process different types of material. (Doc. 26-1 at 62-63; Doc. 26-5 at 13).

Changing the screen requires two employees. During the period relevant to this lawsuit, Walter Deeds and Shawn Griffin usually changed the screens. (Doc. 26-4 at 41-42). Deeds would climb into the hopper to pull the tension plates out.[1] (Doc. 26-4 at 41). He would access the screen

---

[1] A lock out mechanism prevents the hopper, crusher, or other energized components from operating. (Doc. 26-4 at 41, 71, Ex. 6.)

deck to loosen the bolts and remove the tension plates, or screen retaining rails, which hold the screen in place. (*Id.*, Ex. 6).

At ground level, Griffin operated a crane, which was positioned off the southwest corner of the mill. (Doc. 26-5 at 18). Deeds would attach a strap to the screen, and then signal Griffin to lift the old screen from the hopper with the crane and lower it to the ground. (Doc. 26-4 at 41). The crane would then lift the new screen to the screen deck, where Deeds would unstrap it, move it into position, and reaffix the tension plates with the bolts. (*Id.* at 43, 53, Ex. 6).

There was nowhere in the hopper to stand once the screens were out. (Doc. 26-1 at 31). According to Lucio, the employees had to straddle the crossbar structure that supports the screens. (*Id.*).

Prior to Lucio's accident, one of the overhead I-beams had a hole that, according to Levy, an employee working inside the hopper could use as a tie off point for fall protection.[2] (Doc. 26-5 at 26). Alternately, Levy asserts, employees could use I-beam or "D" clips to attach to the overhead I-beams as a tie off point. (Doc. 26-2 at 19; Doc. 26-3 at 35). There were not, however, welded-on anchor points for use with a fall protection system; after the accident, Levy added anchor points. (Doc. 26-2 at 27; Doc. 26-5 at 42).

Lucio began working at Fulton Mill in 2009. (Doc. 26-1 at 9). For three years he worked at the slag cooling pit. (*Id.* at 11-12). He later transferred to a loader position where he removed slag from the ladles used at the NSBS facility for transfer back to Fulton Mill. (*Id.* at 12-13). Upon hire,

---

[2] Lucio disputes that mill workers had training to use, or ever did use, the I-beam hole as a tie-off point, and that such a tie-off point was acceptable fall protection. (Doc. 31 at 13-14).

he acknowledged receipt of the Mini Mill Uniform Rules and Regulations, which mandated that he use fall protection where required (Doc. 27-1 at 8, Levy-420).

In early February, 2013, Lucio transferred to plant operations, where he was assigned to work with Deeds and Griffin. (Doc. 26-1 at 13-14). Lucio observed Deeds and Griffin perform the screen change on one occasion, and had helped them with screen changes two other times before his accident on February 25, 2013. (*Id.* at 29-30).

That day Lucio was on the Tower Two screen deck helping Deeds with the screen change. (*Id.* at 38-39). Neither was wearing a fall protection harness. (Doc. 26-5 at 34; Doc. 26-3 at 36). Griffin was operating the crane. (Doc. 26-4 at 55). The three had removed both of the old screens and had one new screen in place. (Doc. 26-1 at 40). Shortly thereafter, Lucio fell. (*Id.* at 41).

Lucio does not know what caused him to fall, but he believes he either slipped or lost his balance. (*Id.*; Doc. 26-4 at 54). Deeds did not see him fall. (Doc. 26-2 at 31-32). Deeds was working on moving the new screen into position and when he looked up Lucio was gone. (*Id.*). From the crane below, Griffin saw Lucio falling head first over the edge of the hopper, but he did not see what caused Lucio to fall. (Doc. 26-4 at 54). Lucio did not fall on the walking platform five to six feet beneath the hopper, but instead hit the guardrail surrounding that platform and fell to the ground. (Doc. 26-1 at 38, 40-41; Doc. 26-4 55, Ex. 1). No one else witnessed the accident. (Doc. 27-1 at 4). Lucio sustained serious injuries and received workers' compensation benefits. (Doc. 1 at 22).

Following the accident, representatives of Levy, Edw. C Levy Co., and NSBS conducted a joint investigation, which is known as an ICAM investigation. (Doc. 26-4 at 61; Doc. 27-1 at 5, Levy 117-134). Levy also performed an independent investigation (Doc. 27-1 at 5, Levy 135-41.), as did

5

OSHA. (Doc. 31 at 14). The investigations concluded that employees were not regularly using fall protection to change the screens. (Doc. 26-4 at 34; Doc. 27-1 at 5, Levy 122-23, 127-28, 138.)

Lucio cites several corporate safety documents spelling out Levy's fall protection policy. (Doc. 31). The documents – which reference governmental and industry safety regulations – state, *inter alia*, "[o]ne hundred percent (100%) fall protection will be provided for all employees who are working near the edge of a building, a platform, an open shaft, or any areas that pose a possibility of falling six feet or more." (Doc. 31 at 10-11). Lucio alleges Levy did not follow or enforce these policies, and intended for employees to change screens without adequate fall protection. (*Id.*).

To prove that Levy's failure to provide adequate fall protection to its employees was the result of "deliberate, conscious, and intentional *actions*" (Doc. 38 at 14) (emphasis in original), Lucio offers the testimony of Vincent Gallagher, a former OSHA investigator. While at OSHA, Gallagher, who has a Masters Degree in Occupational Safety and Health, investigated more than 500 workplace falls. "He also investigated more than 700 jobsites for the sole purpose of identifying, evaluating, and controlling fall hazards."[3]

Gallagher intends to testify, *inter alia*:

> It is my opinion that [Levy] violated the principles and practices of safety management and the principles and practices of fall hazard control because they consciously permitted and intentionally required this work to be done while workers were exposed to a risk of serious injury or death so high that an injury incident such as [Lucio's] was inevitable. It is my opinion that they violated the aforementioned OSHA standard, the standards of the American Society of Safety Engineers and ANSI, and their own fall procedure. It is my opinion that this incident was not an accident. It was planned, intended and

---

[3] Gallagher outlines his credentials and experience in his report (Doc. 31-10 at 5) and in his affidavit (Doc. 31-11 ¶¶ 2, 5).

consciously implemented when, for years, they deliberately required workers to be repeatedly exposed to extraordinary fall hazards.

(Doc. 38-1 at 16).

## Discussion

As noted above, there are two motions pending: 1) Levy's motion to exclude the testimony of Lucio's expert (Doc. 33); and 2) Levy's motion for summary judgment (Doc. 25). I address each in turn.

### A. Motion to Exclude

Where a party challenges testimony of an expert witness, Fed. R. Evid. 702 triggers a court's "gate-keeping role" to determine the admissibility of that testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1992). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise:
>
> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> b) The testimony is based on sufficient facts or data;
>
> c) The testimony is the product of reliable principles and methods; and
>
> d) The expert has reliably applied the principles and methods to the facts of the case.

The party offering the expert has the burden of proving admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

"Rejection of expert testimony 'is the exception, rather than the rule.'" *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 781 (N.D. Ohio 2013) (quoting Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amend.); *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (same).

With this framework in mind, I now turn to Levy's specific challenges. Levy urges me to exclude Gallagher's testimony on five overlapping grounds:

>1) he is not qualified to testify about fall hazards in a slag mill;
>
>2) he is not qualified to testify as to Levy's state of mind or intent;
>
>3) his testimony is not based on scientific, technical or specialized knowledge;
>
>4) his testimony is based on his own personal beliefs rather than reliable methodology; and
>
>5) other courts have excluded him as an expert.

(Doc. 33).

### 1. Qualifications & Specialized Knowledge

An expert may be qualified via their "knowledge, skill, experience, training or education," or a combination of these factors. Fed. R. Evid. 702. Trial "courts do not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Burgett v. Troy-Bilt LLC*, 579 Fed. Appx. 372, 376 (6th Cir. 2014) (citation omitted).

Gallagher is a former OSHA investigator with a graduate degree in Occupational Safety and Health. He has investigated hundreds of workplace falls and inspected hundreds more jobsites for fall hazards. Based on his education and experience, I am persuaded he has specialized knowledge

that qualifies him to render expert opinions regarding: 1) the nature and extent of fall hazards at the Fulton Mill;[4] and 2) whether Levy violated governmental and industry safety regulations regarding fall hazard control.[5]

I am not persuaded, however, that Gallagher is qualified to render an expert opinion as to Levy's state of mind or intent. Expert testimony as to the intent of a party is "not properly the subject of 'scientific, technical, or other specialized knowledge.'" *CMI-Trading v. Quantum Air*, 98 F.3d 887, 890 (6th Cir. 1996) (citing Fed. R. Evid. 702); *see Mar Oil Co.*, *supra*, 973 F. Supp. 2d at 786 ("No expert, however, knows a party's state of mind."). Levy's intent is certainly not within Gallagher's field of expertise, nor is it within the purview of expert opinion testimony.

"Expert testimony," as I have previously observed:

> as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case. The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and

---

[4] Levy attacks Gallagher's qualifications to testify on this issue by pointing out he "has never seen this, or any, slag mill in operation, nor has he been to any other slag plant." (Doc. 33-1 at 6). That does not matter. What matters, *vis-a-vis* his qualification, is that he knows the dangers of being injured in a fall in multiple worksite situations. *See U.S. v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977) ("[A] proposed expert witness should not be required to satisfy an overly narrow test of his own qualifications.") (internal quotation marks and citation omitted). Given the endless variety of workplace circumstances, many of which probably are unique, even on similar jobsites, to adopt Levy's tunnel-vision view would eliminate, as a practical matter, almost all expert testimony in these type of cases except in that rare instance when the same expert had visited the same site following the same sort of accident. Indeed, broad, rather than limited experience probably enhances an expert's qualifications.

[5] Levy argues violations of governmental and industry safety regulations are not admissible as proof in an intentional tort case. (Doc. 39 at 3-4). I agree, but Levy's argument nonetheless misses the mark. It is well-settled that an expert can relate the basis for his opinion even if that basis is not itself admissible. *See, e.g.*, *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 853 (6th Cir. 1981) (expert can form opinion based on inadmissible evidence). I could alleviate any confusion that distinction might cause a jury with a cautionary instruction that safety standards and their violation are not proof of intent.

permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.

*Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, 2015 WL 3505793, *14 (S.D. Ohio) (citation omitted).

Accordingly, I exclude Gallagher's opinion on Levy's state of mind or intent. He is, however, qualified to render expert opinions on the two issues listed above.

### 3. Methodology & Reliability

As noted by the Sixth Circuit:

> The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. Indeed, we have recognized that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony."

*In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (citations omitted).

The reliability of an expert's testimony: "means that it must be 'supported by appropriate validation – i.e., "good grounds," based on what is known.'" *Id.* (citing *Daubert*, 509 U.S. at 590). Stated differently, reliability does not depend on the accuracy of the opinion but "whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30. As the *Daubert* Court noted:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the [scientific] validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not the conclusions they generate.

509 U.S. at 594-95.

Moreover, whether the "specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 525 U.S. 137, 153 (1999).

Here, Gallagher formed his opinions by reviewing: 1) the pleadings; 2) deposition transcripts; 3) Lucio's affidavit; 4) interrogatories and disclosures; 5) Levy's corporate safety documents and meeting minutes regarding fall hazard control; 6) incident reports; 7) photos of the area where Lucio fell; and 8) governmental and industry safety regulations. (Doc. 38-2 ¶ 3). He also performed a site inspection at the slag mill plant, where he viewed Tower 2, the screen deck and the surrounding areas involved in its operation. (*Id.*).

Thus, Gallagher bases his opinions on the particular facts of this case and principles and practices of fall hazard control that the safety industry has tested, subjected to peer review, and accepted as authoritative. Given that the reliability inquiry is a flexible one, I am satisfied Gallagher's methodology meets threshold requirements. Levy could test the strength of Gallagher's opinions on cross-examination, and the jury could assess its weight.

### 3. Exclusion of Gallagher's Testimony in Other Cases

Levy cites several cases in which courts limited or excluded Gallagher's testimony in the past. Presumably, Levy does so to convince me to follow suit. I am not convinced. The fact that Gallagher is a professional witness and other courts have disallowed his testimony involving other circumstances is immaterial.

Accordingly, I deny Levy's motion to exclude except as to testimony regarding Levy's state of mind or intent.

### B. Summary Judgment

Levy moves for summary judgment on: 1) Lucio's claim under § 2745.01; and 2) Lucio's wife's loss of consortium claim.

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### 1. § 2745.01

Section 2745.01, governing employer intentional torts, provides, in relevant part:

> (A) In an action brought against an employer by an employee for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.
>
> (B) As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.[6]

---

[6] Section 2745.01(C) sets forth a rebuttable presumption of intent to injure if an employer removes a safety guard. That section is inapplicable because Lucio does not allege Levy removed a safety

Seeking *via* § 2745.01 to "significantly [to] restrict" recovery for claims of employer intentional tort, *Kaminski v. Metal & Wood Prods. Co.*, 125 Ohio St. 3d 250, 263 (2008), the General Assembly intended to limit such recovery to situations in which an employer acts with the "specific intent" to "cause an injury to another." *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 134 Ohio St. 3d 491, 497 (2012);  Kaminski v. Metal & Wood Prods. Co., 125 Ohio St. 3d 250, 263 (2008) *see also Hoyle v. DTJ Ents., Inc.,* 143 Ohio St. 3d 197, 200 (2015).

As the *Kaminski* court explained, employer liability cannot

> be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury.

125 Ohio St. 3d at 273-74*; see Houdek, supra,* 134 Ohio St. 3d at 497 ("[A]bsent a deliberate intent to injure another, an employer is not liable for a claim alleging an employer intentional tort, and the injured employee's exclusive remedy is within the workers' compensation system.");  *see also Hoyle, supra,* 143 Ohio St. 3d at 200.

Construing all the *admissible* evidence in a light most favorable to Lucio, I find nothing in the record demonstrating that Lucio can prove that Levy intended him to fall off the tower, or that it wanted him to be seriously injured. A jury could find that Levy was grossly negligent, reckless, and willfully wanton  – and, indeed, deliberately indifferent and/or willfully blind *vis-a-vis* the potential risk of injury. But that does not equate to the deliberate, specific intent called for under § 2745.01, *Houdek*, and *Kaminski*.

As stated in *Kaminski, supra*:

> It further reasons that "[e]ven if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly

---

guard. (Doc. 26-1 at 75).

> permitting a hazardous work condition to exist, knowingly ordering employees to perform an extremely dangerous job, willfully failing to furnish a safe place to work, willfully violating a safety statute, failing to protect employees from crime, refusing to respond to an employee's medical needs and restrictions, or withholding information about worksite hazards, the conduct still falls short of actual intention to injure that robs the injury of accidental character."

125 Ohio St. 3d at 273 n.16 (quoting 6 Larson's Workers' Compensation Law § 103.01 (2008)).

Lucio argues that rather than basing my analysis on *Houdek/Kaminski*, I should base it on the more recent Ohio Court of Appeals decision in *Cantu v. Irondale Indus. Contractors, Inc.*, 2012 WL 6681863 (Ohio Ct. App.). (Doc. 31 at 25-26). But *Cantu* ignores *Houdek*'s explanation regarding the requisite intent required for an employer to be held liable under the statute. *Cantu* states that *Houdek* defined "deliberate intent" as "specific intent." *Cantu*, *supra,* 2012 WL 6681863, at *5. Quoting Black's Law Dictionary, *Cantu* states "specific intent" is "a term ordinary used in criminal law meaning a subjective desire or knowledge that the prohibited result will occur." *Id.* That is not the definition used in *Houdek*.

Further, the definition used in *Cantu* – "a subjective desire or knowledge that the prohibited result will occur," *Id.* at *5 – is essentially identical to the appellate court's definition in *Houdek* – "objectively believed the injury was substantially certain to occur." 134 Ohio St. 3d at 491. Yet, the Ohio Supreme Court found the definition in *Houdek*, "ignored the statutory definition of 'substantially certain.'" *Id.* The proposed definition in *Cantu* therefore appears to conflict with *Houdek*. *See generally Spangler v. Sensory Effects Powder Sys., Inc.*, 2015 WL 3466583 (N.D. Ohio).

I am bound by the Ohio Supreme Court's decision regarding the interpretation of Ohio's worker's compensation laws. *See In re Dow Corning Corp.*, 778 F.3d 545, 548-49 (6th Cir. 2015).

I am not bound by state appellate court decisions that conflict with decisions of Ohio's highest court. *See J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1485 (6th Cir. 1991); *Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988).[7] *Cantu* is therefore not controlling in this case.

In light of the above, the only conclusion I can reach on this record is that there is no genuine issue of fact material to Lucio's claim under § 2745.01.

### 2. Loss of Consortium

Because Lucio's claim fails as a matter of law, his wife's loss of consortium claim also fails. In *Walburn v. Lockheed Martin Util. Servs.*, 2010 WL 1253601, *7 (S.D. Ohio) (citations omitted), the court explained:

> Generally, a loss of consortium claim is a derivative claim dependent upon the existence of a primary claim, and it can be maintained only so long as the primary claim continues. Because a derivative claim cannot afford greater relief than that relief permitted under a primary claim, a derivative claim fails when the primary claim fails.

As discussed, there is no genuine issue of material fact as to Lucio's § 2745.01 claim. There is therefore also no genuine issue of material fact as to his wife's loss of consortium claim.

---

[7] Lucio emphasizes that the Ohio Supreme Court twice chose not to review *Cantu* on appeal. This does not negate the fact that I must apply *Houdek*. See *J.C. Wyckoff & Assocs*, 936 F.2d at 1485; *Welsh*, 844 F.2d at 1245.

**Conclusion**

Because there is no genuine issue of material fact as to either of the Lucios' claims against Levy, summary judgment is warranted.

For the forgoing reason, it is hereby

ORDERED THAT

1. Levy's motion to exclude opinion of Vincent Gallagher (Doc. 33) be, and the same hereby is, granted in part and denied in part; and

2. Levy's motion for summary judgment (Doc. 25) be, and the same hereby is, granted.

So ordered.

                                  /s/ James G. Carr
                                  Sr. U.S. District Judge